UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MICHAEL JENNINGS, #00A6254,

                              Plaintiff,

v.

L. MULLEN, M.D., et al.

                              Defendants.

---

**REPORT AND
RECOMMENDATION**

03-CV-0948A(M)

---

This case was referred to me by Hon. Richard J. Arcara for supervision of pretrial

proceedings in accordance with 28 U.S.C. §636(b)(1) (Dkt. #51). Before me are defendants'[1]

motion for summary judgment (Dkt. #43), and plaintiff's cross-motion for summary judgment

(Dkt. # 52). For the following reasons, I recommend that defendants' motion be GRANTED in

part and DENIED in part, and that plaintiff's cross-motion be DENIED.

### BACKGROUND

Plaintiff, an inmate, commenced this 42 U.S.C. §1983 action *pro se* against

defendants, all of whom, with the exception of defendants S. Miller, M.D. and Lynn Kostecki-

Csanyi, M.D., were employees of the New York State Department of Correctional Services

---

[1]       To date, defendants Mullen, and Cagles (each of whom allegedly treated plaintiff while
he was incarcerated at the Downstate Correctional Facility ("Downstate")) have not been served with the
Complaint (Dkt. ##12, 26, 45, p. 2). Consequently, "defendants" herein will refer only to the moving
defendants. Plaintiff was repeatedly reminded that it was his responsibility to timely effect service upon
all defendants (Dkt. #2, p. 2, Dkt. #4, p. 1). By separate Text Order, I am directing plaintiff to show cause
why the action should not be dismissed against defendants Mullen and Cagles pursuant to Fed. R. Civ. P.
4(m).

("DOCS").[2]  Plaintiff alleges that defendants failed to treat his claims of back pain while he was housed in Attica from December 5, 2000 to December 24, 2003 (Dkt. #1, Dkt. #47, Ex. A, Bates No. 000108).  Each defendant was sued in an individual as well as official capacity (Dkt. #1).

In 1992 plaintiff (DOB 10/18/55) was in a motor vehicle accident which resulted in an injury to his lower back, requiring two surgeries, including microdiskectomy in 1993 and a lumbar laminectomy in 1994 (Dkt. #47, Ex. A, Bates No. 0000298).  Prior to his incarceration, plaintiff had been receiving pain management treatment from Ronny Hertz, M.D. of The Manhattan Center For Pain Management (the "MCPM") (Id.; Ex. 53, Ex. A2).  By letter dated August 22, 2000 to the "Department of Correction", Dr. Hertz stated that plaintiff had been treating with him for  number of years for "severe back pain" (Dkt. #53, Ex. B).  Spinal cord stimulation and injection therapy had proven to be unsuccessful (Id.).  At that time, plaintiff was on a medication regimen that included duragesic patches, Roxicodone, and Pamelor (Id.).[3]

Dr. Hertz cautioned that "[f]ailure to maintain his medication regime [sic] will result in severe and persistent back pain and will give him problems in dealing with his daily life" (Id.).  He also requested that plaintiff "be allowed to do physical therapy as needed, as well as get trigger point injection of his back from time to time" (Id.).  Plaintiff also relies on a similar undated handwritten letter dated from Robert Taglia, M.D. to "whom it may concern" indicating

---

[2]    Dr. Miller and Dr. Kostecki-Csanyi provided services to inmates on a contractual basis (Dkt. #45, p. 2).

[3]    Plaintiff's medical screening upon his entry to DOCS custody indicated that he had a history of chronic back pain and that his current medications included Nitroglycerin Patches, Duragesic Patches, Roxicodone, Pamelor, and Prevacid (Dkt. #47, Bates No. 000058; Dkt. #53, Ex. B8).

that he had been plaintiff's treating physician since 1989 and that plaintiff had a history of mydocardial infraction and should "have with him at all times NTG"[4] (Dkt. #53, Ex. D).

Plaintiff entered DOCS custody on September 21, 2000 at Downstate, and on December 5, 2000, was transferred to the Attica Correctional Facility ("Attica") (Dkt. #47, Ex. A, Bates No. 000384). Immediately following his transfer, plaintiff was admitted to inpatient care at Attica when he advised that he had a spinal injury and suffered a mydocardial infraction in 1981 (Dkt. #47, ¶8, Ex. A, Bates No. 000198-199). The following day, plaintiff was observed by a nurse to not be in pain and to "move fairly well for someone with chronic back pain" (Id. at Bates No. 000384). Despite the nurse's observations, plaintiff was prescribed Duragesic patches and Percoset for his back pain (Id. at Bates No. 000382). At plaintiff's request, on December 13, 2000, he was discharged to his cell with a cane permit and continued on Duragesic patches and Percoset, with a follow-up visit scheduled in one to two months (Id. at Bates Nos., 000196, 000382). On December 19, 2000, plaintiff requested to be fed in his cell for 30 days due to spinal pain, and also requested a pain management consultation (Dkt. #47, ¶17; Bates No. 000370).

Plaintiff was treated by Robert Takos, M.D. on December 26, 2001, who renewed plaintiff's Percoset and Duragesic patches (Id. at Ex. A, Bates Nos. 000369-370). Dr. Takos examined plaintiff again on January 3, 2001, and noted plaintiff's treatment with the MCPM and that he "was on MS Contin, percoset, . . . the Fentanil Patch, . . . [and] Roxycet" (Id. at Bates 000367-368). Upon examination, Dr. Takos concluded that plaintiff's "ability to walk and move his body indicate that the disability or impairment and pain he has is a good deal less than the

---

[4]        Although not stated in the letter, I assume that "NTG" refers to Nitroglycerin.

tremendous quantities of narcotics he consumes daily. It is my clinical opinion that he doesn't need these high doses of narcotics and I intend to reduce them" (Id. at Bates No. 000367). He also noted that plaintiff had built a resistance to Oramorph and Roxycet (Id. at Bates No. 000368). He discontinued plaintiff's Percoset and Duragesic patches, and started plaintiff on Methadone (Id.). Dr. Takos ordered that plaintiff be placed on medical rest and fed in his cell. He also requested a new MRI of plaintiff's back, a consultation with an orthopedic surgeon, and a nerve conduction study of plaintiff's back and legs (Id.).

On January 8, 2001, plaintiff complained of the changes to his pain medication, and Dr. Takos increased his Methadone dosage (Id. at Bates No. 000366). However, plaintiff continued to complain that the Methadone was not effective for his pain (Id. at Bates No. 000365). On January 25, 2001, plaintiff received an orthopedic consultation from Sheldon Stein, M.D. (Id. at Bates No. 000310). However, because plaintiff was claustrophobic, an MRI was not conducted (Id.).

On February 1, and again on February 14, 2001, Dr. Takos rescheduled plaintiff's orthopedic consultation because the nerve conduction study had not been completed (Id. at Bates No. 000362-363). On February 14, 2001 Dr. Takos also increased plaintiff's Methadone dose because of plaintiff's complaints of pain (Id.), but advised plaintiff that his clinical presentation did not match his experience with patients with back surgery or lower back problems (Id.). Dr. Takos noted that plaintiff was "on years of narcotics -high doses- physical/mental dependency vs. chronic pain" (Id.). Plaintiff advised Dr. Takos that the Mental Health Unit prescribed him Pamelor (Id.). On February 21, 2001, Dr. Takos noted that he would continue plaintiff's increased dosage of Methadone pending the outcome of the specialist evaluation (Id. at Bates No.

000361). Plaintiff's March 1, 2001 medical record indicates that in addition to Methadone, he was receiving Baclofen, a muscle relaxer (Id. at Bates No. 000361).

Pursuant to Dr. Takos' request, on March 19, 2001, Dr. Kostecki-Csanyi of ECMC performed a nerve conduction study, which found that "both [lower extremities] are normal with the exception of prolonged latency of the sural sensory responses bilaterally [, which] may indicate an early sensory neuropathy" (Id. at Bates Nos. 000240, 000305-307). An MRI was also conducted on March 20, 2001 by Michael S. Fishman, M.D., which found that the L2-3 and L4-5 vertebrae were normal and that there were "minimal degenerative changes . . . present at L3-4 and L5-S1, but . . . no significant impingement on neural elements" (Id. at Bates No. 000287). On March 22, 2001 Dr. Stein rescheduled his orthopedic consultation because the MRI results were unavailable, but noted that plaintiff "ambulates well [without] evidence of pain and/or discomfort" (Id. at Bates No. 000308).

On March 22, 2001, Dr. Takos decreased plaintiff's Methadone dosage (Id. at Bates No. 000359), and plaintiff complained to defendant C. Turton, R.N., and the other nurses about increased pain (Id. at Bates Nos. 000359-357). Consequently, on March 27, 2001, Dr. Takos' admitted plaintiff to the hospital for observation for pain (Id. at Bates No. 000358). Dr. Takos notes reflect that upon admission to the hospital, plaintiff stated "I'm not doing so good", but "[c]linically plaintiff appears to be in no acute distress . . . . I expect he will suffer some mental changes during withdrawal" (Id.). On March 29, 2001, plaintiff signed a medical refusal form and was discharged to his cell (Id. at Bates No. 000330).

Dr. Takos' treatment notes for April 17, 2001 state:

"I spoke [with] Dr. Fishman about [plaintiff's] MRI. The changes seen are not consistent with the patient's claim of pain needing powerful narcotics in large doses. I reviewed the case [with] Dr. Fishman and we are agreed I will order an MRI with contrast to be sure we haven't missed something. There is a risk in using contrast. I have . . . ask[ed] the emergency cart be near the MRI room. I have reviewed Dr. Stein's orthopedic consult as well as my own physical examination of [plaintiff]. Impression: Mild back degeneration without impingement. DC methadon start Motrin" (Id. at Bates No. 000354).

On April 18 and 20, 2001, Nurse Turton noted that plaintiff was complaining of pain, but that he ambulated without evidence of pain or difficulty (Id. at Bates Nos. 000353-354). On April 26, 2001, plaintiff was examined by Dr. Takos, who noted that plaintiff ambulated with his cane and sat and stood without difficulty (Id. at Bates No. 000353). Dr. Takos also reviewed plaintiff's March 2001 MRI with him and repeated his opinion that he did not have a medical need for narcotics (Id.). On May 1, 2001 plaintiff continued to complain to Nurse Turton of pain and requested Naprosyn, which was prescribed by Dr. Takos (Id. at Bates No. 000352). On May 22, 2001, Dr. Takos referred plaintiff to the Center for Pain Management at the Erie County Medical Center ("ECMC Pain Management Center") noting that he was "interested in options that do not include narcotics" (Id. at Bates No. 00035; Dkt. #53, Ex. J). Plaintiff was evaluated by defendant S. David Miller, M.D. of the ECMC Pain Management Center on September 5, 2001, who concluded that plaintiff had

"undergone extensive pain management in the past including multiple procedures without significant control of pain. Historically, use of long-acting opioid with short-acting opioid for breakthrough pain has provided for best level of pain relief. Patient reports that he is in pain today. Patient does have some reproducible pain at the level of the lubosacral junction. Patient

-6-

does not exhibit any neurologic changes in the right lower extremity as compared to the left with normal motor function and reflexes. Patient has undergone recent diagnostic imaging . . . without evidence of scar formation about the nerve root, nor significant neural impingement.

At this time options for treatment are limited. You can explore pharmacologic management using non-opioid based medications, though I am not certain that you will achieve any significant degree of success . . . . You may wish to initiate Ultram . . . [and] to concomitantly treat with a nonsteroidal anti-inflammatory medication . . . . Additionally, you may wish to add a medication that had benefit with respect to neuropathic pain such as Neurontin . . . .

I do not believe that [plaintiff] would benefit from any additional injection procedures or other more invasive interventions . . . .

Patient does have depression and there may be a behavioral component to pain. You may wish to have [plaintiff] evaluated by a psychologist and receive treatment accordingly.

Prospects for pain control using . . . physical therapy are limited . . . . Use of a stationary bicycle or a walking program should be encouraged" (Id. at Bates Nos. 000300-301).

On June 9, 2001 an MRI was conducted by Dr. Fishman, which found "no abnormal enhancement at any location [and] no evidence of impingement on neural elements in any visualized portion of the lumbar spine" (Id. at Bates No. 000243).

On September 24, 2001, Dr. Takos had Dr. Miller's report evaluated by Dr. Laskowski, who prescribed plaintiff Ultram and Neurontin pursuant to Dr. Miller's recommendations (Id. at Bates No. 000277). Dr. Takos next examined plaintiff on December 26, 2001 and prescribed Celebrex and increased his dosage of Ultram (Id. at Bates No. 000273). At this time, Dr. Takos also referred plaintiff for further pain management therapy, noting that plaintiff's "back pain still significant . . . . He is doing physical therapy as instructed . . . If you

believe narcotic pain relief is indicated we have methadone.  Codeine and Morphine pills" (Id. at Bates No. 000297).

Plaintiff was first examined by defendant Jose dePerio, M.D. on March 14, 2002. At that time Dr. dePerio cancelled Dr. Takos' referral for the ECMC Pain Management Center because "other treatment modalities recommended ha[ve] not been tried", and did a call-out for plaintiff to undergo physical therapy (Id. at Bates No. 000269).  Dr. dePerio's March 19, 2002, notes indicate that plaintiff refused physical therapy and requested a morphine derivative (Id.). Dr. dePerio found that plaintiff's current medications were adequate for pain control (Id.).  At Dr. dePerio's request, in April 2002, plaintiff forwarded his records from his treatment at the MCPM to Nurse Administrator Frisbee (Dkt. #32, Bates No. 000018).  On May 2, 2002, plaintiff was advised by defendant James Conway, Attica's First Deputy Superintendent, that his medical records from the Manhattan Pain Clinic were under review by Dr. dePerio (Id. at Bates No. 000014).[5]

Plaintiff continued his complaints of back pain to Nurse Turton (Id. at Bates Nos. 000268-269) and was again seen by Dr. Takos on April 16, 2002, at which time complained of back spasms and requested trigger point injections (Id. at Bates No. 000268).  Dr. Takos scheduled a follow-up with the ECMC Pain Management Center for July 1, 2002 for evaluation of plaintiff's lumbar trigger points and to perform injections, if necessary.  However, plaintiff failed to attend the appointment (Id. at Bates No. 000292-293).

---

[5]     Contrary to defendant Conway's May 2, 2002 memorandum to plaintiff, Dr. dePerio's affidavit indicates that plaintiff's treatment records were provided to Dr. Takos (Dkt. #47, ¶85).

Plaintiff was treated at the ECMC Pain Management Center on August 12, 2002 by Daniel Salcedo, M.D. (Id. at Bates No. 000235). Plaintiff received trigger point injections, and Dr. Salcedo reported that "other interventional procedures/modalities tried in the past [without] benefit. No further attempts . . . recommended. Since patient did well functionally [with] controlled use of narcotic analgesics, may re-start" (Id.). Dr. Salcedo also recommended that moist heat be applied daily to plaintiff's back and that he receive physical therapy (Id.). Based upon these recommendations, on August 20, 2002, Dr. Takos prescribed plaintiff Morphine and discontinued plaintiff's prescription of Ultram (Id. at Bates No. 000259-260). On August 22, 2002, plaintiff requested long lasting trigger point injections from Nurse Turton who noted that plaintiff was walking briskly and "barely even using a cane" (Id.). Likewise, on August 28, 2002, plaintiff complained to Nurse Turton that he wanted slow release Morphine rather than the oral Morphine prescribed, and she scheduled a medical call-out (Id. at Bates No. 000260). Plaintiff was seen by Dr. Takos on August 30, 2002 and requested that he receive three hot showers a day, but withdrew this request when Dr. Takos informed him that this would require him to move to the infirmary (Id. at Bates No. 000258). Plaintiff also advised that he did not think that "physical therapy is any help" (Id.). Dr. Takos' impression was that plaintiff was an "obese male in no distress who moves normally" (Id.).

On October 15, 2002, plaintiff requested a replacement for his Indocin from Nurse Turton and informed her that he was in more pain than before the Morphine was prescribed. Nurse Turton requested a medical call-out (Id. at Bates No. 000257). Plaintiff was seen by Dr. Takos on October 28, 2002, and at that time requested that his Morphine be changed (Id. at Bates No. 000256). Dr. Takos noted that it "seems like a high dose ordered by Dr. Salcedo", but

was unable to reach him (Id.). Dr. Takos continued his attempts to reach Dr. Salcedo on November 1 and 4, 2002, until he received a response from Thomas Polisoto, M.D. of the ECMC Pain Management Center, who recommended that plaintiff be prescribed Oramorph (Id. at Bates Nos. 000254-255). Because the ECMC Pain Management Center was "winding down", Dr. Polisoto also recommended that plaintiff receive a physical evaluation for pain from a pain specialist (Id. at Bates No. 000254).

At the request of plaintiff, by letter dated October 8, 2002 Dr. Salcedo and Dr. Polisoto repeated the recommendations contained in their August 12, 2002 report to Dr. Takos (Id. at Bates No. 000233-234). They also made additional recommendations, including sustained release medications, exercise, and trigger point injections two to four times per year (Id.).

On November 19, 2002, upon being advised that plaintiff was not receiving Oramorph as prescribed, Dr. Takos contacted the pharmacy and learned that the drug he was receiving was an equivalent (Id. at Bates No. 000252). On February 28, 2003, plaintiff complained that his pain was not controlled on his current regimen. Consequently, on March 17, 2003 plaintiff was again seen by Dr. Takos, but indicated that he had no complaints of pain at that time (Id. at Bates No. 000248). Thereafter, plaintiff continued his medication regimen without complaint until September 2, 2003, when Dr. Takos referred plaintiff to the pain management clinic at Strong Hospital and requested that they consider trigger point injections (Id. at ¶88, Ex. A, Bates No. 000189).

On November 10, 2003, plaintiff was evaluated by Frank Colarusso, D.O., who found that plaintiff suffered from chronic low back pain with failed back syndrome and gave plaintiff trigger point injections (Id. at Bates Nos. 0000187-189). Dr. Colarusso recommended

-10-

that plaintiff's dosage of Morphine be increased, that his prescription for Indocin be discontinued, and that he be started on Vioxx (Id.). Dr. Colarusso also recommended that he receive trigger point injections every four months or with exacerbation and undertake an exercise program. He also noted that plaintiff might benefit from treatment for his depression, which was likely secondary to his chronic pain (Id.). In accordance with Dr. Colarusso's recommendations, plaintiff was prescribed Vioxx. However, Dr. dePerio ordered that plaintiff's dose of Oramorph remain at the same level (Id. at Bates No. 000111).

Plaintiff's complaint was filed on December 19, 2003 (Dkt. #1)[6], seeking relief under 42 U.S.C. §1983 by alleging that his inadequate medical treatment constituted cruel and inhuman punishment in violation of the Eighth Amendment, as well as a violation of the due process and equal protection clauses of the Fourteenth Amendment (Id., ¶42).[7]

## DISCUSSION AND ANALYSIS

### A. Summary Judgment Standard

The standard to be applied on a motion for summary judgment in this Circuit is well settled. " 'Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue

---

[6]    Although the caption of plaintiff's complaint states "Southern District of New York", the complaint was filed in this court.

[7]    Since neither the motion nor the cross-motion addresses plaintiff's claims under the Fourteenth Amendment, I express no opinion as to the validity of those claims.

of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party.' " Ford v. Reynolds, 316 F. 3d 351, 354 (2d Cir. 2003) (quoting Marvel Characters v. Simon, 310 F. 3d 280, 285-86 (2d Cir. 2002)).

At the outset, I note that defendants argue that plaintiff's cross-motion for summary judgment should be denied because he failed to submit a statement of undisputed facts, as required Local Rules of Civil Procedure 56.1 (Dkt. #55, ¶5). Although "[f]ailure to submit such a statement may constitute grounds for the denial of the motion"(Local Rule 56.1(a)), even ignoring this oversight, plaintiff's cross-motion for summary judgment should be denied for the reasons set forth below.

**B.      Eighth Amendment Claim: Deliberate Indifference**

To establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The "deliberate indifference" standard consists of both objective and subjective components. Hathaway v. Coughlin, 37 F. 3d 63, 66 (2d Cir. 1994), cert. denied, 513 U.S. 1154 (1995).

Under the *objective* component, the alleged medical need must be "sufficiently serious." Id. (internal quotation marks and citations omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Id.

(internal quotation marks and citations omitted). "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance v. Armstrong, 143 F. 3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). "The medical condition does not have to occur immediately; it suffices if the condition presents itself in the next week or month or year." Moore v. McGinnis, No. 01-CV-6588, 2004 WL 2958471, *6 (W.D.N.Y. December 20, 2004) (Siragusa, J.) (internal quotation marks omitted).

Under the *subjective* component, the prisoner must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. Hathaway v. Coughlin, 99 F. 3d 550, 553 (2d Cir. 1996). "[T]he subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994)). See also Hernandez v. Keane, 341 F. 3d 137, 144 (2d Cir. 2003), cert. denied, 543 U.S. 1093 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness" (internal quotation marks and citation omitted)). In order to be found "sufficiently culpable," the official must "know[] of and disregard[] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837.

Plaintiff admits that he received "rudimentary courses of treatment" while in DOCS custody, but argues that such treatment was deliberately indifferent because defendants ignored the prior medical treatment he received from the MCPM for his chronic pain resulting from failed back syndrome and other injuries he sustained in a 1992 motor vehicle accident (Dkt. #53, p. 14). Plaintiff also alleges that "[d]ue to the denial of proper medications . . . , plaintiff began to have another existing medical problem in the form of high blood pressure which was life threatening due to his heart disease" (Dkt. #53, pp. 7-8; see Dkt. #1, ¶39). Even assuming *arguendo* that plaintiff's condition constitutes a serious medical condition, I find that he cannot establish the subjective component of an Eighth Amendment claim. There is no evidence that defendants knew of and disregarded an excessive risk to plaintiff's health.

The record of plaintiff's medical treatment, as summarized above and discussed further below, demonstrates that plaintiff received extensive treatment for his chronic back pain while at Attica:

### 1. Dr. Takos

When he examined plaintiff on January 3, 2001, Dr. Takos noted his prior treatment with the MCPM, but concluded that plaintiff's physical condition did not warrant the amount of narcotic pain killers he was receiving and that he had built a resistance to Oramorph (Dkt. #47, Ex. A, Bates No. 000367-368). Consequently, he discontinued plaintiff's Percoset and Duragesic Patches and started plaintiff on Methadone (Id.). In turn, Dr. Takos placed plaintiff on medical rest and ordered that he be fed in his cell. He also ordered a MRI of plaintiff's back, an orthopedic evaluation, and a nerve conduction study (Id.).

-14-

Both the nerve conduction study and MRI supported Dr. Takos' assessment that plaintiff's condition did not warrant his pre-incarceration medication regimen. (Dkt. #47, ¶27, Ex. A, Bates Nos. 305-307; Bates No. 000287). However, when plaintiff complained of pain following Dr. Takos decreasing his Methadone dosage in March 2001, Dr. Takos promptly admitted plaintiff to the hospital for observation; but shortly thereafter, plaintiff signed a medical refusal form and was discharged (Id. at Bates Nos. 000330, 357-359). Following plaintiff's hospitalization, Dr. Takos consulted with Dr. Fishman concerning plaintiff's case, and ordered a contrast MRI to be certain that he had not "missed something" (Id. at Bates No. 000354). This too showed "no evidence of impingement on neural elements" (Id. at Bates No. 000243).

Nevertheless, when plaintiff's complaints of pain continued, Dr. Takos referred him to the ECMC Pain Management Center in September 2001, where he was examined by Dr. Miller, who concluded that the options for treatment were limited, but recommended using Ultram and Neurontin and encouraged an exercise program (Id. at Bates Nos. 000300-301). Days later, plaintiff was prescribed Ultram and Neurontin (Id. at Bates No. 000277). As plaintiff's complaints of pain continued, Dr. Takos referred plaintiff for further pain management therapy, in December 2001, April 2002, and September 2003, consulted with the doctors who treated plaintiff, and implemented their recommendations (Id. at Bates Nos. 000292-293, 000297).

This course of treatment demonstrates that Dr. Takos was extremely attentive to plaintiff's condition, by seeking out pain management specialists, having diagnostic tests performed, and continually modifying his treatment modalities in accordance with the recommendations of these specialists, in an effort to lessen plaintiff's pain. While plaintiff argues that Dr. Takos ignored the pre-incarceration treatment he received at the MCPM, Dr. Takos

-15-

ultimately followed the treatment modalities recommended by Dr. Hertz, including trigger point injections, physical therapy, and a medication regimen. Even though Dr. Takos initially disagreed with the amount of narcotic pain killers that were prescribed to plaintiff, when plaintiff's pain persisted despite alternative medications, he requested a recommendation from the ECMC Pain Management Clinic as to whether narcotic pain medication was warranted (Id. at Bates No. 000297). Based upon Dr. Salcedo's recommendation, Dr. Takos prescribed Morphine to plaintiff (Id. at Bates Nos. 000235, 000259-260). While Dr. Takos did not initially prescribe narcotic pain killers to plaintiff, it is clear that this was not an arbitrary decision, but rather was based on plaintiff's observed ability to ambulate and the results of the MRIs and nerve conduction study (which did not suggest that he was in distress), and his concern that plaintiff had developed an addiction to narcotic pain killers (Id. at Bates No. 000367).

Despite the fact that Dr. Takos did not follow Dr. Hertz's treatment plan from the outset, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." Chance, supra, 143 F. 3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Id. (citing Dean v. Coughlin, 804 F. 2d 207, 215 (2d Cir. 1986)); see also Goodson v. Evans, 438 F. Supp. 2d 199, 203 (W.D.N.Y. 2003) (Larimer, J.) ("Although plaintiff may subjectively believe that his care was not adequate or correct, though, that difference of opinion does not demonstrate deliberate indifference and does not give rise to an Eighth Amendment claim."); Ross v. Kelly, 784 F. Supp. 35, 44-45 (W.D.N.Y. 1992) (Larimer, J.), aff'd, 970 F. 2d 896 (1992), cert. denied, 506 U.S. 1040 (1992) (acknowledging that "courts have

repeatedly held that a prisoner does not have a right to the treatment of *his* choice" (emphasis in original)).

Plaintiff's reliance on Martinez v. Mancusi, 443 F. 2d 921 (2d Cir. 1970), cert. denied, 401 U.S. 983 (1971) is misplaced. In Martinez, the prison warden had the plaintiff removed "from the hospital before he was ready to be moved, despite the surgeons' orders and without obtaining a discharge", and the court concluded that this conduct "was more than mere negligence". Martinez, supra, 443 F. 2d at 924. In this case, by contrast, it was Dr. Takos who had plaintiff admitted to the hospital for observations because of his pain, and it was plaintiff who signed a waiver requesting his discharge (Dkt. #47, Ex. A, Bates No. 000358). As evidenced by the differing opinions of the various pain management specialists involved in plaintiff's care (including Dr. Hertz, Dr. Miller, Dr. Salcedo, Dr. Polisoto, and Dr. Colarusso), there was no clear method for treating plaintiff's pain. The proper treatment for plaintiff's back pain was a "matter for medical judgment", which is insufficient to establish a deliberate indifference claim. Estelle, supra, 429 U.S. at 107.

Moreover, plaintiff alleges that Dr. Takos' failure to treat his pain caused him to sustain increased blood pressure "near stroke levels", which was left untreated by Dr. Takos despite his pre-existing heart condition (Dkt. #53, p. 8). To support his allegation, plaintiff relies on a medical chart depicting plaintiff's blood pressure from December 5 through 11, 2000 and the letter of his prior treating physician, Dr. Taglia indicating that he should have nitroglycerin with him at all times (Dkt. #53, Ex. D). At worst, Dr. Takos' alleged conduct in failing to treat plaintiff's high blood pressure caused from his pain demonstrates negligence in light of his extensive efforts to manage plaintiff's pain, not deliberate indifference and, thus, cannot support

an Eighth Amendment claim. See Estelle, supra, 429 U.S. at 106 ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Hathaway, supra, 99 F.3d at 553 (observing that "mere allegations of negligent malpractice do not state a claim of deliberate indifference").

Alternatively, plaintiff argues that Dr. Takos intentionally withheld portions of plaintiff's medical records, including records relating to his prior treatment with the MCPM. However, there is nothing in the record to support this assertion (Dkt. #53, pp. 8-9). Plaintiff also argues Dr. Takos falsely reported that plaintiff was doing well under physical therapy, despite the fact that he never received physical therapy. Even assuming that Dr. Takos falsely reported that plaintiff was participating in physical therapy, this does not establish Dr. Takos' deliberate indifference. Significantly, this statement was included in Dr. Takos' referral for plaintiff to undergo pain management therapy, thereby undermining any contention that the statement was made to *deprive* plaintiff of medical treatment (Dkt. #47, Ex. A, Bates No. 000297). In any event, the record demonstrates that plaintiff *refused* to undergo physical therapy for his back pain (Id. at Bates Nos. 000258, 000269).

### 2.    Dr. de Perio

Dr. dePerio had far less involvement in plaintiff's care and treatment. It appears that he first treated plaintiff on March 14, 2002, and at that time cancelled the pain management clinic referral ordered by Dr. Takos because physical therapy, which had been a recommendation contained in Dr. Miller's September 2001 report, had not been tried (Id. at Bates No. 000269). At that time, Dr. dePerio also requested that plaintiff have his records from the MCPM forwarded to

DOCS (Dkt. #32, Bates No. 000018).  Dr. dePerio's only other involvement in plaintiff's care

appears to have occurred on November 12, 2003 when, contrary to Dr. Colarusso's

recommendation, he did not increase plaintiff's dosage of Oramorph (Dkt. #47, Ex. A, Bates No.

000111).

Plaintiff contends that Dr. dePerio acted with deliberate indifference by not

scheduling plaintiff for physical therapy, and "by falsely making medical determinations on

examinations he never performed [and that] [s]uch determinations both cut and discontinued

plaintiff's pain medications" (Dkt. #53, p. 9).  These arguments are belied by the record, which

demonstrates that on March 19, 2002, several days after plaintiff was seen by Dr. dePerio, he

refused to undergo physical therapy, and that at that time Dr. de Perio maintained plaintiff's

medication regimen, rather than reducing it (Dkt. #47, Ex. A, Bates No. 000269).

Plaintiff also argues that Dr. dePerio was deliberately indifferent to his medical

needs by cancelling plaintiff's visit to the ECMC Pain Management Center (Dkt. #53, p. 9).

However, the record demonstrates that this was not done in an effort to deprive plaintiff of proper

treatment, but rather because physical therapy had not been utilized to treat plaintiff's pain, as

initially recommended by the ECMC Pain Management Center.

Ultimately, plaintiff's disagreement with the care provided by Dr. dePerio does not

amount to a constitutional claim.  See Estelle, supra,  429 U.S. at 106.  Even crediting plaintiff's

allegations, Dr. dePerio's decisions to cancel plaintiff's pain management therapy and to not

increase plaintiff's Oramorph dosage in accordance with Dr. Colarusso's recommendation,

demonstrate at most negligence, not deliberate indifference. See  id.; Hathaway, supra, 99 F.3d at

553.

### 3.  Nurse Turton

Plaintiff's medical records reflect that he was seen on numerous occasions by Nurse Turton, who noted plaintiff's complaints, ordered medical call-outs, and made various notations about her observations of plaintiff's condition.  Plaintiff alleges that Nurse Turton was deliberately indifferent to his medical needs "by intentionally recording false 'observation' notes", and that her "biased recordings of plaintiff's medical complaints of pain and the insufficiency of pain medications were made in a callous attempt to undermine, delay and or deny plaintiff access to medical care and treatment" (Dkt. #53, pp. 12-13).  However, plaintiff has failed to set forth any evidence to support these speculative assertions.  In fact, Nurse Turton's numerous observations that plaintiff ambulated normally and did not appear to be in distress (Id. at Bates Nos. 000259, 000274, 000352-354, 000359) were also noted by others, including Dr. Takos (Id. at Bates No. 0000258, 000273, 000353, 000358, 000362) and other nurses (Id. at Bates No. 000264 (June 14, 2002 entry); Bates No. 000268 (April 5, 2002 entry); Bates No. 000365 (January 29, 2001 entry); Bates No. 000366 (January 10, 2001 entry); Bates No 000384 (December 6, 2000 entry)).  Moreover, on at least one occasion, Nurse Turton noted that plaintiff appeared to be in distress and was using his cane to raise and lower himself from his chair (Id. at Bates No. 000357).  Additionally, defendants have offered the unrebutted expert opinion of Dr. dePerio that Nurse Turton was not deliberately indifferent to plaintiff's complaints of back pain (Dkt. #47, ¶107).

4. **Dr. Kostecki-Csanyi and Dr. Miller**

Dr. Kostecki-Csanyi and Dr. Miller both performed outside consultations of plaintiff. At the request of Dr. Takos and prepared reports containing their findings. Plaintiff contends that they were deliberately indifferent to his medical needs by failing "to intervene with the way plaintiff's serious injury was treated, they recklessly allowed a course of treatment that they know were ineffective and entailed substantial risk of harm to plaintiff due to his heart disease", and by ignoring the recommendations of his previous physicians (Dkt. #53, pp. 10-11).

Dr. Kostecki-Csanyi's sole involvement in plaintiff's care was to perform a nerve conduction study (at Dr. Takos' request) report on her findings (Dkt. #47, Ex. A, Bates No. 000305-307). Likewise, Dr. Miller evaluated plaintiff at Dr. Takos' request and made recommendations regarding plaintiff's pain management treatment. (Id. at Bates No. 000287). Even if Drs. Kostecki-Csanyi and Miller could be found to have control over plaintiff's medical treatment, based upon my finding that the conduct of Drs. Takos and dePerio did not rise to the level of deliberate indifference, I likewise find no basis in the record to suggest that Drs. Kostecki-Csanyi and Miller knowingly disregarded plaintiff's condition.

5. **Defendants Conway, Herbert, Howard, Goord, and Wright**

Throughout his incarceration at Attica, plaintiff made various complaints and filed grievances concerning his alleged inadequate medical treatment, which were investigated and responded to by defendants James Conway, First Deputy Superintendent of Attica, John Howard, M.D., DOCS Regional Medical Services Director, Lester Wright, DOCS Chief Medical Officer, Victor Herbert, Superintendent of Attica, and Glenn S. Goord, DOCS Superintendent (Dkt. #53,

-21-

Ex. A1 A7- A9, M; Dkt. #32, Ex. B, Bates Nos. 000016-17, 000024-50). Plaintiff concedes that

he may not rely on the doctrine of *respondeat superior* to establish liability in this action, but

argues that defendants Conway, Herbert, Howard, Goord, and Wright were personally involved in

the Eighth Amendment violation by failing to remedy his complaints of inadequate medical care

and by being grossly negligent in managing their subordinates (Dkt. #53, Point II).

"[P]ersonal involvement [by a supervisor] cannot be established based on the

receipt of a letter or grievance." Ifill v. Goord, No. 03-CV-355, 2005 WL 2126403, at *4

(W.D.N.Y. September 2005) (Skretny, J.) (citing Woods v. Goord, No. 01 Civ. 3255, 2002 WL

731691, at *7-8 (S.D.N.Y. April 23, 2002)). However, because I have found that there was no

Eighth Amendment violation by Dr. Takos, Dr. dePerio, Nurse Turton, Dr. Miller, or Dr.

Kostecki-Csanyi, even assuming that defendants Conway, Herbert, Howard, Goord and Wright

could be shown to have sufficient personal involvement in the disputed conduct, see Atkins v.

County of Orange, 251 F. Supp. 2d 1225, 1234 (S.D.N.Y. 2003) ("Personal involvement will be

found . . . if an official acts on a prisoner's grievances or otherwise responds to them."), the

claims as against these defendants must be dismissed as well.[8]


## C.    Official Capacity Claims

Plaintiff does not dispute that his claims against the defendants in their official

capacities are barred by the Eleventh Amendment. See Will v. Michigan Dep't of State Police,

---

[8]      Because plaintiff has failed to establish an Eighth Amendment deliberate indifference
claim against defendants, it is unnecessary for me to address defendants' qualified immunity arguments
directed to plaintiff's Eighth Amendment claim (Dkt. #45, Point II). However, since defendants have
not addressed plaintiff's Fourteenth Amendment claims (due process and equal protection violations), I
cannot decide at this point whether qualified immunity would apply to those claims.

491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) (holding that neither the state, its agencies, nor its employees acting in their official capacities are "persons" subject to suit under 42 U.S.C. §1983). Therefore, I recommend that defendants' motion be granted to the extent it seeks dismissal of plaintiff's official capacity claims.

## CONCLUSION

For these reasons, I recommend that defendants' motion for summary judgment (Dkt. #43) be GRANTED to the extent of dismissing plaintiff's claims based upon the Eighth Amendment, and his claims against defendants in their official capacity, but that it otherwise be DENIED, and that plaintiff's cross-motion for summary judgment (Dkt. #52) be DENIED. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**

DATED:  September 13, 2007

JEREMIAH J. MCCARTHY
United States Magistrate Judge